We have two cases to be argued this morning, but we still want you to stay within your time because we have other things to do today too. We'll call the first case for today, which is United States of America v. Olga Sandra Murra, etc. We'll hear first from Mr. Yudishin. May it please the Court, my name is Robert Yudishin and I represent Olga Murra. As the Court, I'm sure, knows that Ms. Murra was convicted of forced labor and harboring illegal aliens. In the context of this case, there was a lot of testimony presented at the trial concerning Ms. Murra's alleged psychological and physical coercion and abuse of the alleged victims. And that testimony was hotly contested at the trial. The defense presented contrary evidence to the government's testimony about the abuse. And so that really leads me to the context of the first point of error in the brief, which has to do with the government's presentation of an expert witness, Dr. Shannon Wolf, to talk about trauma bonds. And Dr. Wolf, at least in her own words, was presented to tell the jury about the dynamics of abusive relationships and to give what she called a general description of what's out there in the field of psychology. She talked specifically about trauma bonds and what she said trauma bonds were, and the implication was that the alleged victims in the case were traumatically bonded to Ms. Murra. She did not testify to that, did she? She did not. And that's really the essence of the error is that she gave a lot of general testimony about trauma bonds, which I take it was meant for the jury to infer that the witnesses in the case against Ms. Murra suffered from trauma. Isn't it well settled that an expert witness can be called for that purpose and does not have to express an opinion if the testimony is helpful, the judge finds the testimony to be helpful to the trier of fact, the jury, or whoever it is? Your Honor, that's essentially the government's argument that they're allowed to put on a teaching expert to talk about something like trauma bonds, that the problem with that argument is that it's contrary to Rule 702 and the federal rules of evidence. Rule 702 really has four prongs that have to be met for the admissibility of expert testimony, and one of which is that the expert, in the words of the rule, the expert has reliably applied the principles and methods to the facts of the case. The government would have this court write that portion of the rule out of existence and that perhaps leads us to the old saw that it's close enough for government work if we met three out of four of the provisions of the rule but we don't have to meet the fourth prong. You're right, Dr. Wolfe never said anything at all about the specific application of her trauma bonds to the witnesses in the case. She had never examined the witnesses. She wasn't asked hypothetical questions about the witnesses. She didn't review any records about the witnesses. She just gave some general testimony about trauma bonds. Seems like you would have liked that, the fact that she didn't tie it to your client. Well, perhaps, except that in this case, the government put on these witnesses to talk about how they were psychologically and physically coerced. The defense put on witnesses to talk about how that wasn't true and there was no psychological or physical coercion. And so then the government comes along with an expert who apparently was unwilling or unable to say these witnesses really did suffer from trauma bonds but talked about how if someone's traumatically bonded to an alleged perpetrator, then they may stay with that person, for example, for years, which is what these people did with Ms. Moore. They lived with her in her home for a number of years. Even after they left the home, they maintained contact with Ms. Moore. And so the expert testimony, while it might in some ways sound helpful, it really wasn't in this case because it was really designed to bolster the government's case and explain why these witnesses who claimed they were being abused didn't leave for years and then came back and maintained contact with Ms. Moore. So there was no objection that it was irrelevant? No, there was an objection. There was a pretrial motion that was filed on that, and Judge O'Connor held a hearing on that motion and determined that testimony would be allowed, and part of that motion did say that it was irrelevant because it wasn't applied to the facts of the case. I mean, I don't think this Court has ever issued an opinion saying you don't have to have Part IV of the rule in order to admit expert testimony, because otherwise, so the defense could have called a ---- Let's assume it was error for her, for the judge to allow that testimony. Why wasn't it just harmless there? Because the underlying facts were really hotly disputed. You have a group of people saying they were psychologically coerced and another group of people saying they weren't psychologically coerced, so now all of a sudden we have an expert kind of implying that the psychological coercion is true. And so the district court allowed that testimony to be presented to the jury without any application of that testimony to the facts of the case. Did you have an expert witness? Ms. Moore did have an expert witness, but not, well, we called an expert witness to talk about the fact that trauma bonds really aren't recognized psychological phenomena. They're not in the DSM. So you offered some rebuttal to that. We offered some rebuttal, which doesn't mean it should have been allowed, but, yes, there was a rebuttal testimony offered. So what did you allow? Did you allow, I guess your argument would have been that they weren't trauma bond, they just voluntarily did everything they did. And that was essentially the gist of the argument at trial, that these witnesses were not forced to stay with Ms. Moore or were not forced to work for Ms. Moore. They were part of Ms. Moore's family or extended family, if you will, and that there was no psychological or physical coercion. I mean, that was the way testimony that was presented from the defense to the jury. And so the expert, in my opinion, the harm comes from the expert tipping kind of the balance and putting some imprimatur of reliability, so to speak, on what these witnesses testified had happened to. And in that sense, it shouldn't have been allowed. It would be the same as if the defense had wanted to call an expert not just to rebut the trauma bonds, but let's say the defense wanted to have a psychologist come in and say the witnesses were bipolar, and because they're bipolar, they're likely to make up stories, and you can't believe them without ever examining the witnesses or responding to hypothetical questions based on the facts of the case or reviewing records. Just throw some psychologist up there to put a theory out there for the jury to hang their hat on. And I think that's what the rule was designed to prevent. The government points to the commentary to the rule in support of this idea that you can put a teaching expert on, and there's nothing wrong with that. And, of course, the commentary is contrary to the plain language of the rule. I mean, again, like the government, it writes out the fourth prong in the rule. The commentary cites absolutely no case for that proposition. And if you read all the commentary about all the aspects of the rule, I mean other aspects of the rule, there are cases that support the commentary. There's no case that supports that aspect of the commentary. And then the commentary, again, if you read all of it, it's contradictory in that there's, for example, an example in the commentary about a government expert being called to talk about the use of code words in a drug transaction, and the commentary says that that is admissible if the testimony is reliably applied to the facts of the case. And that's surely correct because that's what the rule says. And so the commentary, I would say in this instance, is not something the Court should rely on. It's both unsupported by any case law, and it contradicts itself in trying to explain the application of the rule. If the government's allowed just to throw a teaching expert up there to bolster their case, then I think we create a situation where both sides can just put experts up there, like I talked about with an expert saying that the government's witnesses are bipolar or have some other psychological disorder that would have caused them to fantasize, lie. And that's going to be confusing and misleading to the jury, and it's not really helpful to say that both sides can do that. And that's something that the rule doesn't allow. So I would urge that there was error based on the government being allowed to present an expert witness to bolster the government's case without the expert applying that testimony to the facts of the case. And that actually ties in to another one of our points of error, because while the government's allowed to put on this psychological testimony about trauma bonds and use that to explain why these witnesses did what they say they did, these witnesses were in counseling and receiving apparently psychological services, and so we have a point of error where we try to obtain records from Mosaic Legal Services concerning the counseling relationship that these people had with Mosaic, and the district court refused to turn over those records to the defense based on an asserted psychotherapist patient privilege. And it seems to kind of tie these two points of error together, it seems fundamentally unfair to allow the government to put on psychological testimony on the one hand and we know the witnesses that the psychological testimony is at least impliedly talking about these witnesses are in counseling and receiving psychological services, but then we're denied access to those records that could be used to show how these people did not suffer from trauma bonds, but we weren't able to review those records to see were they really traumatically bonded to misremember. Didn't HIPAA protect them from that invasion? Well, yes and no. I mean, there is a general, I guess, rule of confidentiality under HIPAA, and I try a lot of cases, and so certainly a court under HIPAA can order a doctor, a psychologist, a counselor, to turn over records if they're relevant material to the issue in a case. And I get those kind of records in trials all the time. One of the litigants, right? I'm sorry? It would be relevant to one of the litigants, but maybe not the witnesses. Well, I've done it both ways, and I think in this case, well, let's flip it around. Let's say the defendant was going to raise an insanity defense and put on experts, and then the government's going to be entitled to those records and be able to contest it. And so to me, it's the same thing. You've got complainants coming in here saying, and there was testimony at the trial about their psychological coercion and victimization and what they experienced, and they testified about going to Mosaic Legal Services or Family Services for help in deciding whether they were victims of human trafficking and they were in counseling. It's just fundamentally unfair to allow the government to present psychological testimony and then deny the defense the best evidence to rebut the testimony, which would be whether these people really are traumatically bonded. And that's what, without ever having seen those records, because we haven't been given access to them, I would suspect that that would be the best evidence, as opposed to calling some other expert saying, well, no, there is no such thing as trauma bonds. Let's see what's actually in those records to see if these people really do have some traumatic bonding to Ms. Moore. And to kind of continue talking about the denial of the records, it's also unfair to let the witnesses, I think, get on the stand and talk about going to Mosaic and what Mosaic did, and Mosaic kind of told them apparently that they were victims of human trafficking and sent them to the government for prosecution, again, without allowing the defense to have access to any of the records to see if the story that Mosaic packaged up and put together and sent over to the government is the same now as what these witnesses are testifying about in court. There was no way to test that because all the Mosaic records, except for a very tiny fraction of them, were withheld from the defense, based both on psychotherapist patient privilege and attorney client privilege, when Mosaic was really kind of the instigator, so to speak, of this. But you're not disputing that they were talking to counselors and lawyers. I mean, you agree that that's who they talked to at Mosaic, don't you? I do. And I think it can be waived, those conversations, if you get on the stand and you talk about, hey, I went to Mosaic and I talked to counselors and lawyers and I went there. Well, it's one thing to say I met with a lawyer. It's another thing to discuss what you talked with a lawyer about. I mean, you're saying an admission that you talked to a lawyer constitutes a waiver of what you talked to the lawyer about? Well, in this case, it's a little more complicated than that because I think they admitted and testified that they went to the lawyers to talk about whether they were victims of human trafficking, which was the same issue that was in play at the trial. So it's clear that's what they were talking to Mosaic about was the same thing they're testifying at trial. Also, and if I may, I mean, I can see my time's up, but just one of the witnesses specifically said she didn't have a lawyer and said that on more than one occasion. So to withhold records on the basis of an attorney-client privilege, which belongs to the witness, not the attorney, when the witness is saying I don't have a lawyer, that seems fundamentally unfair to me. Your time has expired. Thank you. You'll have some time on the book. Mr. Magliolo? I'm sorry. Did I pronounce it right? Yes, sir. May it please the Court. Joe Magliolo for the United States. Judge Dennis, you're exactly right that it is well settled that a teaching witness may be used in cases where they're explaining a subject that is not within the common understanding of a lay jury, if that testimony is reliable and fits the facts of the case and if the witness is particularly qualified to give that testimony. That has been the case in a number of decisions from the Northern District of Texas, a decision from the Southern District of Mississippi, a decision from the District of Kansas, and at least a decision from the Southern District of Ohio. And, in fact, one of the cases upon which Ms. Muirer relies is United States v. Coutinhos from the Eighth Circuit. And in that case, the Eighth Circuit indicates that a teaching witness, under this advisory committee note to Rule 702, would on occasion be appropriate. In that case, for reasons specific to that case, it was not appropriate, but the Court indicated that there were occasions where teaching witnesses would be appropriate. And I believe this is precisely the type of case where a teaching witness was appropriate because the subject of trauma bonds is not something within the common understanding of a jury. It is a technical, psychological concept that's been the subject of a great deal of academic research and peer-reviewed articles and is something on which Dr. Wolfe was an accredited expert, and she testified that it was a recognized concept in the field of psychology. So she gave this general explanation of the field of trauma bonding, which helped put into context some of the previous testimony the jury had heard from Ingrid Guerrero, one of the victims, and Vinia Rodriguez, another one of the victims. I think it's also worth pointing out that while Ms. Muirer now challenges the fact that Dr. Wolfe failed to inspect the victims and that somehow vitiates the Rule 702 expert principle applying to her, when she initially challenged Dr. Wolfe at the trial court level, she argued that if Dr. Wolfe were able to inspect the victims and to opine about whether or not they were subject to trauma bonding, that would invade the province of the jury. She's now making the opposite argument, arguing that she should have actually inspected the victims of Ms. Muirer's crimes. Well, but as I understood the argument, it is that she should have applied all of the psychological testimony and her information about trauma bonds, she should have applied that to the facts of this case. That's what I understand their argument to be. So whether she examined the victims or reviewed some records or listened to the testimony of other witnesses and then gave an opinion based on having heard that testimony, their argument is that all of that information about trauma bonds was never applied to the facts of this particular case. That's what I understand their argument to be. Am I misunderstanding you? You're not, Your Honor. The point I was trying to make simply was that they made the opposite argument at the trial court level, and now that that argument didn't work for them and the government decided to use Dr. Wolfe as a teaching expert, they're now arguing the opposite, that she should have actually examined the records and opined on whether or not they were subject to trauma bonding. Was she present in the courtroom when testimony was given? I don't believe she was, Your Honor. She did testify after the two victims testified, though. And I think with respect to the trauma bonding, Ms. Muirer's counsel does not give sufficient credit to the fact that she was subject to cross-examination. The victims were subject to cross-examination. She was allowed to present her own psychological expert to talk about trauma bonding. The jury was left to make its own decisions. There was no imprimatur of authority when Dr. Wolfe was subject to vigorous cross-examination, as were the witnesses in this case. And to Judge Dennis, to your point, I don't believe that it was error to allow Dr. Wolfe to testify, but even if this Court finds that it was error, her testimony was not the fulcrum upon which the government's entire case turned. The Court heard and the jury heard from the victims. They heard very compelling testimony from the victims and corroborative witnesses, and they saw the disciplina tape, which showed sort of a microcosm of all the abuse these witnesses were subjected to. So I don't believe that it was error to allow Dr. Wolfe to testify, but I certainly don't think that the Court ought to reverse on that basis, even if it finds that there was error. Turning to the issue concerning privilege,  to compel Mosaic Services to produce attorney-client and therapist-patient privilege documents, because Ms. Murrah has failed to show completely that Mosaic or the clients waive the privilege in any way, either explicitly or implicitly. Ms. Murrah seems to contend that if somebody speaks about a subject with a third party and then goes to an attorney or goes to a therapist or goes to a doctor to speak about that same subject, that if they ever talk about that same subject outside of the scope of the privilege, then the privilege is somehow waived. And I don't think that's this Court's law. Ms. Murrah relies heavily on the United States v. Oster case. And Oster is a very informative case for the subject because I think it reaches a — it directs a very different conclusion than Ms. Murrah seeks. In the Oster case, this Court found that a troubled person who was going to therapists and making threats to his therapist about third parties didn't have a reasonable expectation of confidentiality when he made those threats because he well knew, and this was established on the record and in the footnote to the case, that his therapist had an ethical duty under Louisiana law to turn over and warn people about the contents of these threats. So the Court found that there was no expectation of confidentiality when the person made these threats because he knew, he well knew that the threats were going to be communicated by his therapist to third parties, and they were, in fact, communicated to third parties. In this case, there's nothing actually on the record that indicates that the people who went to Mosaic knew that anything they said would be communicated to a third party or that it actually was communicated to a third party. There's a number of places in the record to which Ms. Murrah cites that she relies upon very heavily to indicate that there was some sort of privilege waiver. For example, on page 1429, there's an indication that Mosaic Services put victims in touch with a Homeland Security agent, but all that is said on that page in the record is simply that. They were put in touch with a Homeland Security agent. There's no waiver, there's no indication on the record there or otherwise that any confidential communications were ever disclosed. Additionally, with respect to the attorney-client relationship, that's established by a stipulation that the parties reached on pages 2031 and 2032 of the record. So the attorney-client relationship exists, and there's additionally no indication on the record that anything that was discussed with the Mosaic attorneys was actually disclosed to a third party. In no respect did any of the Mosaic victims, the victims in this case, turn over any confidential information or act in any way that was inconsistent with the privilege. I think the subject matter-based waiver that Ms. Murrah calls for would have an extremely harmful effect on the necessary trust relationship that should exist between a doctor and their patient, a therapist and their client, and an attorney and their client. What she would have is if somebody went to their attorney for a problem or went to a doctor for a problem of a very sensitive nature, and then they talked about that subject matter later in court, they disclosed, let's say, a sexual assault to the police, anything they told their doctor or anything they told their attorney would necessarily be waived. That would expand this circuit's waiver principle, I think, far, far past it's ever gone before, and it would narrow the privilege doctrine to a point where it would be nearly meaningless. I'd also like to discuss the brief challenge comment that the prosecutor made during his closing argument. This comment caused no prejudice to Ms. Murrah because with that comment, the prosecutor was merely attempting to explain the technical difference between what the jury could consider and could not consider when it was reaching a decision on Ms. Murrah's guilt or innocence. When this court has examined— So you're just saying it was harmless. You agree it was inappropriate. No, Your Honor, not conceding prejudice about the comment. All right. When the court engages in a prejudice analysis, it looks at two disjunctive factors. It looks at whether or not the comment had—the prosecutor had the manifest intent with that comment to focus the jury on the defendant's decision not to testify or whether or not the comment would have naturally and necessarily focused the jury on that subject. With this comment, when the court considers whether or not the prosecutor had the manifest intent, it looks to whether or not there's an equally plausible alternative explanation for the comment. And if it finds that there was an alternative explanation for the comment, then it finds that there's no manifest intent. And here, the comment has a plausible alternative explanation immediately after the objection was clarified. It's on pages 2523 and 2524 of the record. In considering the comment in this context, the prosecutor just heard the defense make a significant challenge to the credibility of the government witnesses. So given that the government was about to challenge the credibility of the defense witnesses, it was important for the government to explain the technical difference. Given that Ms. Mira had put on a case, it was important to explain the technical difference between what it could not consider and it absolutely could not consider for the fact that Ms. Mira didn't testify and what it could consider was the credibility and lack of credibility of the defense witnesses. So after the objection was clarified, and before the government even got an opportunity to explain its comment, there was an immediate objection and then it was clarified, and then the government got to explain and provide this plausible alternative explanation. Once that occurred, it did not draw another objection from the other side, which had been very active during closing argument, nor did it draw any opprobrium from the district court. So I think this indicates that it is a plausible alternative explanation, like the comment made in Collins, that shows that no prejudice inerred to the defendant from this comment. Was the jury instruction on point? The court gave two instructions prior to the beginning of closing arguments. Before the evidence was opened, the judge told the jury that they had an obligation not to consider Ms. Mira's decision not to testify. After the evidence closed, the court gave the circuit's pattern jury instruction on the jury's obligation not to consider her silence against her, and then after the challenge comment was made, the court sustained the objection, told the jury to disregard the last comment of the prosecutor, and then it directed the jury back to page two of the jury charge, which was on page 764 in the record, and that page contains the then twice already given instruction about the defendant's right not to testify and the jury's obligation not to take anything from that. So that was during closing argument? Rebuttal closing argument, yes, Your Honor. So given that there is an equally plausible explanation, this court can also consider whether or not the comment would have naturally and necessarily focused the jury on the defendant's decision not to testify. And this is, I submit, not the sort of comment that this court has found naturally and necessarily does so. In the Griffith case and in the Johnston case, those are two cases where this court found that a comment caused prejudice, and they didn't assume prejudice arguendo. They made a specific finding that there was prejudice caused. In the Griffith case, for example, a prosecutor quite literally turned to the defendant during her closing argument and said, Would you like to get up there and testify? And in the Johnston case, the prosecutor made a comment both during his case in chief about the defendant's decision not to testify, and then during his closing argument, he went on a bit of a long run talking about the defendant's right not to testify, and then he followed it up with an incorrect statement of the law. And the court found these comments naturally and necessarily would have focused the jury on the defendant's decision not to testify. This is not that sort of comment. It was brief. It was one sentence. And once it was clarified, given the prosecutor's explanation, the court, there was no further objection, nor did the district court rebuke the prosecutor. If this court finds, however, assuming arguendo, and again, we don't concede error here, but if this court finds that the comment was prejudicial, the court engages in a three-step analysis to determine whether or not there was harmless error beyond a reasonable doubt. Three factors are the magnitude of the comment that was made, the efficacy of the curative instruction, and the weight of the overall evidence against the defendant. All three factors favor the government. The magnitude of the comment must be viewed against the backdrop of the trial itself. And this was a long trial. Even though it lasted only five days, there was, I think, upwards of 25 witnesses. There were hundreds of exhibits. The testimony was emotionally fraught. It was hard fought. Against that backdrop, this is a one-sentence statement during the closing argument, which I think is akin to the statement made in the McMillan case where this court found that a statement that I think is much more acute because the government there said during this closing argument, not one of those defendants is stepping up and saying they did nothing wrong. I think that's a much more acute statement, but this court found that that was an isolated comment that when viewed in context was isolated and didn't necessarily call the jury to focus on the defendant's silence. This is that sort of comment. And viewed in the magnitude of the entire trial, the effect of it, I think, was very slight. The second factor the court looks at is the efficacy of the curative instruction. And again, we've discussed the fact that the judge gave two instructions before closing argument, reflecting this circuit's pattern jury instruction on the jury's obligation not to consider the defendant's silence against him. And then, after the challenge comment was made, there was an immediate objection. The district court sustained the objection, told the jury to put the prosecutor's last comment out of their head to disregard it, and then he referred them back to page 2 of the jury charge, which contains that jury instruction that's relevant here. This court has found in cases like McMillan and Lampton and Ramey that immediate curative instructions of this nature cure any prejudice that a challenge comment might have caused. And finally, the weight of the evidence in this case was strong. Contrary, I think, to Ms. Muir's contention, this is not just a he said, she said case. The jury heard a very compelling story from three victims in this case of Ms. Muir's years and years of physical, spiritual, and mental abuse. Two sisters that met Ms. Muir when they were down on their luck, they were essentially estranged from their parents, fell under Ms. Muir's spiritual sway from a very young age, as did Ms. Muir's half-sister, Fenia. Using this spiritual sway, Ms. Muir punished them. She told them frequently they were going to hell. She forced them to work for them. When they moved to America, she made them stay out in the elements as punishment. She forced them to stay in the garage, and they didn't even have the dignity of being able to choose when they got to use the restroom. And they had to clean houses day after day after day and sometimes even work a second job at night to fund Ms. Muir's lifestyle while receiving no money as a result of all their efforts. The jury also heard corroborative testimony from a number of witnesses who saw the effects of the abuse firsthand as it was occurring, and also from witnesses in whom the victims confided immediately after they escaped Ms. Muir's clutches. So taking that evidence together and coupling it with the disciplina tape, which is a tape Ms. Muir made, and forced the victims to listen to as punishment. And on this tape, it's sort of a microcosm of the entirety of the abuse. She told the girls that she spoke the will of God, that they were going to go to hell. This is something that occurred apparently on a near daily basis. They were going to hell, that they were crazy, that they were mentally retarded. And then I think most tellingly she indicates that one of the girls was out in the garage and it was so hot that it was causing them to perspire, and I think this corroborates the contention and the accusation the victims made, which was they were often made to stay out in the garage for days on end even though it wasn't heated or cooled. So that evidence, taken together with the bank records, which showed that the cleaning revenues funded Ms. Muir's lifestyle, even though there was no indication that any of that money went to Ingrid Guerrero, who was the one doing all the hard work, all that evidence taken together I think indicates the government's case was very strong. And if the Court has no further questions, I'll cede the balance of my time. You said you referred the victims to Homeland Security. Were they ever deported? The victims were not deported at the time of trial. I believe they had a temporary status that allowed them to stay in the country briefly, I think at a year at a time, but they did not receive any full immigration benefits at the time. I think at least one of the victims isn't eligible for any further immigration benefits and probably will likely be deported. Thank you, sir. Mr. Usherton. Let me first talk real briefly about the teaching witness aspect again. And Mr. Magliolo says that that's well settled, that you can put on a teaching witness. Of course, the government doesn't cite any Fifth Circuit case that says that, so I'm not sure how well settled that is. Again, they're asking the Court to do something that certainly this Court has never settled. And the government also argues that the jury would not understand trauma bonds without an expert witness, and that's why they needed a teaching witness to talk about that. But, of course, there's no need for the jury to understand trauma bonds if it's not relevant to the case and it's not applied to the facts of the case. And you can't just put a witness up there just to educate the jury on some topic unless it is real. But you don't think the jury would understand just hearing the witnesses if there was no Dr. Wolf testimony? Don't you think the point came across listening to the victims and the witnesses? The point about why they stayed with Ms. Murr? What would be the result of a trauma bond, in other words, what she was implicating? Well, what the expert was implicating is that the reason these people stayed is because they suffered all this trauma and because of the trauma bond they didn't leave. And even after they did leave, they still maintained contact with Ms. Murr. I mean, that was, I think, the bottom line of what the expert was saying. But would the jury have understood that? I guess the best way to answer that is I think if the expert had applied it to the facts of the case, that would certainly be relevant. But there was no expert. If there was no expert, I think the jury then would be faced with having to decide whether the testimony about the abuse is really true or not and whether it's credible, because there was witnesses saying it didn't happen and the witnesses saying it did happen. That's what they did. They weighed the evidence. Well, they did, except the jury in this case weighed it along with expert testimony that was thrown in there to help them decide on the credibility of what these witnesses were saying. You had your own expert to tell the jury that their expert was talking about something that was not credible, shouldn't be given much weight at all. You had your own expert to counter what Dr. Wolfe offered. He did, and that was only, I guess, necessary because the court allowed testimony that shouldn't have been allowed in the first place. The defense expert really focused on the fact that while Dr. Wolfe was acting like trauma bonds were this well-developed psychological theory, so to speak, that it's not recognized in the DSM and it doesn't really exist out there in, I guess, in the generally accepted psychological community. And so there was contrary testimony about that, but I still don't think that takes away the harm that now the jury's got to sort out, well, which expert to believe on that. I mean, there was still testimony that really shouldn't have come in without it being applied to the facts of the case. I think you just have to wonder if, and I think Judge Graves is right, you don't have to have examined the witnesses, but in some way whether it's sitting through the testimony at trial and saying, okay, I heard what all these people say and that sounds like a trauma bond or answering hypothetical questions based on the facts of the case or reviewing records. I mean, this expert, whether the expert reviewed things or not, I don't know. I mean, I don't know if she was unwilling or unable to. She wasn't asked on cross? I don't recall her being asked that question. It's pretty basic. I would agree. I didn't try the case, and so I don't recall that being asked. So I don't know. The government certainly didn't present anything saying, Dr. Wolf, you reviewed this or did that. And so it was just never tied into the facts of the case other than by inference. Let me kind of just move on real quickly. The government also says there's no showing about that what was discussed with Mosaic was also the same thing discussed with the government. I think this is sort of like making a final argument to a jury. It's a reasonable inference if you go talk to Mosaic about whether you're a victim of human trafficking and then you end up over here at the government and there's a prosecution for human trafficking, the same things were discussed. And there was testimony at trial about that's how you got from Mosaic to the government. And so it's just disingenuous to say, oh, this was something totally different they were talking to Mosaic about. They're talking about the same thing. I mean, I don't think there's any question about that. I don't have the records that I can point that out to you. But the other thing is Vanya Rodriguez was a medical doctor who lived in this country for years, said she didn't have a lawyer. Her records at least should not be privileged. So that's the amount of time. I appreciate it. I'm going to ask the Court to reverse this case.  Thank you, sir.